**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | | |
|---|---|---|
| **WAYLAND DEE KIRKLAND,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | |
| | ) | **Case No.11-2347-JAR** |
| | ) | |
| **DIANE ZADRA DRAKE, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

## MEMORANDUM AND ORDER

Plaintiff Wayland Dee Kirkland, proceeding *pro se* and *in forma pauperis,* brings this action against present and former employees of the Elizabeth Layton Center ("ELC") alleging a conspiracy to violate his civil rights under 42 U.S.C. § 1983 by depriving him of funds received as part of a grant from Mental Health America of the Heartland ("MHAH"). Plaintiff sued Diane Drake, the director of ELC, and ELC employees Jessica Slocum, Donna Johnson, Robin Burgess, Jennifer Stanley, Zack Cyphers and Kevin Kastler (collectively the "ELC Defendants") involved in the services he received in connection with the grant. Plaintiff's conspiracy claim was dismissed pursuant to the Memorandum and Order issued by this Court on May 23, 2012 (Doc. 60); the Court declined to dismiss Plaintiff's § 1983 claims on a motion pursuant to Fed. R. Civ. P. 12(b)(6) because of inadequate information regarding the structure and function of ELC. This matter is before the Court on Defendants' Motion for Summary Judgment (Doc. 61). Plaintiff has not filed a response and the time to do so has expired.[1] As explained more fully below, the ELC Defendants' motion is granted. Plaintiff is also directed to show cause why this

[1]*See* D. Kan. R. 6.1(d)(2) (requiring a response to a dispositive motion to be filed within 21 days).

action should not be dismissed as to the remaining defendants for failure to obtain service.

## I. Summary Judgment Standard

Under D. Kan. Rule 7.4, a "failure to file a brief or response within the time specified . . . shall constitute a waiver of the right thereafter to file such brief or response. . . ."[2] Furthermore, if a "respondent fails to file a response within the time required . . . the motion will be considered and decided as an uncontested motion and ordinarily will be granted without further notice."[3] Nevertheless, "[i]t is improper to grant a motion for summary judgment simply because it is unopposed."[4] This will be the case where the movant fails to make out a prima facie case for summary judgment.[5] It is the role of the court to ascertain whether the moving party has sufficient basis for judgment as a matter of law.[6] In so doing, the court must be certain that no undisclosed factual dispute would undermine the uncontroverted facts.[7]

Summary judgment is appropriate if the moving party "show[s] that there is no genuine issue as to any material fact and that [it] is entitled to judgment as a matter of law."[8] A fact is

---

[2]D. Kan. R. 7.4.

[3]*Id.*

[4]*Thomas v. Bruce*, 428 F. Supp. 2d 1161, 1163 (D. Kan. 2006) (quoting *E.E.O.C. v. Lady Baltimore Foods, Inc.*, 643 F. Supp. 406, 407 (D. Kan. 1986) (citing *Hibernia Nat'l Bank v. Administracion Ctl. Sociedad Anonima*, 776 F.2d 1277, 1279 (5th Cir. 1985))). The Court notes, however, that failing to file a timely response to a motion for summary judgment still waives the right to thereafter respond or otherwise controvert the facts alleged in the motion. D. Kan. R. 7.4.

[5]*Id.* (citations omitted).

[6]*Id.* (citing *Lady Baltimore Foods*, 643 F. Supp. at 407).

[7]*Id.*

[8]Fed. R. Civ. P. 56(a).

only material under this standard if a dispute over it would affect the outcome of the suit.[9] An issue is only genuine if it "is such that a reasonable jury could return a verdict for the nonmoving party."[10] The inquiry essentially determines if there is a need for trial, or whether the evidence "is so one-sided that one party must prevail as a matter of law."[11]

The moving party bears the initial burden of providing the court with the basis for the motion and identifying those portions of the record that show the absence of a genuine issue of material fact.[12] "A movant that will not bear the burden of persuasion at trial need not negate the nonmovant's claim."[13] The burden may be met by showing that there is no evidence to support the nonmoving party's case.[14] If this initial burden is met, the nonmovant must then "go beyond the pleadings and 'set forth specific facts' that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant."[15] When examining the underlying facts of the case, the court is cognizant that all inferences must be viewed in the light most favorable to the nonmoving party and that it may not make credibility determinations or weigh the evidence.[16]

---

[9]*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[10]*Id.*

[11]*Id.* at 251–52.

[12]*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

[13]*Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003) (citing *Celotex Corp.*, 477 U.S. at 325).

[14]*Id.*

[15]*Id.*

[16]*See Scott v. Harris*, 550 U.S. 372, 378 (2007); *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986).

Because Plaintiff is a *pro se* litigant, the court must construe his pleadings liberally and apply a less stringent standard than that which is applicable to attorneys.[17] However, the court may not provide additional factual allegations "to round out a plaintiff's complaint or construct a legal theory on a plaintiff's behalf."[18] The court need only accept as true the plaintiff's "well-pleaded factual contentions, not his conclusory allegations."[19] Additionally, a *pro se* litigant is not excused from complying with the rules of the court and is subject to the consequences of noncompliance.[20]

## II. Uncontroverted Facts

All material facts set forth by the ELC Defendants are deemed admitted for the purpose of summary judgment, as Plaintiff failed to specifically controvert them as required under D. Kan. R. 56.1(a).[21]

***Organization and Structure of ELC***

ELC is a not-for-profit community mental health center licensed by the State of Kansas, serving Miami and Franklin Counties. ELC has tax exempt status under Section 501(c)(3) of the Internal Revenue Code. Defendants are employees and former employees of ELC: Drake is the director; Johnson is Director of Quality Assurance and Risk Management; Burgess is a Mental

---

[17]*Whitney v. New Mexico*, 113 F.3d 1170, 1173 (10th Cir. 1997).

[18]*Id.*

[19]*Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991) (citation omitted).

[20]*Ogden v. San Juan Cnty.*, 32 F.3d 452, 455 (10th Cir. 1994) (citing *Nielsen v. Price*, 17 F.3d 1276, 1277 (10th Cir. 1994)(insisting that *pro se* litigants follow procedural rules and citing various cases dismissing *pro se* cases for failure to comply with the rules)).

[21]That rule provides: "All material facts set forth in the statement of the movant shall be deemed admitted for the purpose of summary judgment unless specifically controverted by the statement of the opposing party." D. Kan. Rule 56.1(a).

Health Therapist; Stanley is the Director of Community Support Services; Slocum and Kastler are case managers; and Cyphers is a former case manager. Defendant Drew Whitmore is also an employee of ELC and Defendant Colt Coffman is a former employee. Neither Whitmore nor Coffin has been served with process.

ELC is governed by a volunteer Board of Trustees with eleven members who are self-selected. While the County may make recommendations for Board of Trustee members, it may not appoint members. Board members include citizens from Franklin and Miami Counties. ELC is not a community developmental disability organization ("CDDO"), but rather, a community mental health center ("CMHC"). The CDDO for Miami County is Tri-Ko, Inc., and the CDDO for Franklin County is COF Training Services, Inc.

ELC has a Participating CMHC Contract with the Secretary of the Kansas Department of Social and Rehabilitation Services ("SRS"). The Participating CMHC Contract sets forth guidelines for using funds, outcome measures, and other tasks and conditions that ELC must complete and meet. The Contract does not provide that ELC may disburse funds to other affiliate programs. ELC contracts with other organizations on a very limited basis. The only contracting ELC does is to reimburse DCCCA in Lawrence, Kansas for respite services for children. ELC only reimburses DCCCA and has no control over how DCCCA operates.

Mental Health America of the Heartland ("MHAH") administers a housing grant called the Blaylock grant. The funds for the grant come from MHAH. MHAH determines who receives the money and how that money may be spent. Any purchases made with leftover money must be approved by MHAH. ELC's service area has two Blaylock grant slots. ELC helps its patients apply to obtain one of those grant slots, and helped Plaintiff apply for the

Blaylock grant. Plaintiff was awarded a Blaylock grant on April 28, 2010. Included in the grant were "start-up funds" to purchase household necessities with assistance from a case manager at ELC.

***Plaintiff's Allegations***[22]

Using the start-up funds, Plaintiff's case manager, Defendant Slocum, purchased a washer, dryer and refrigerator, which Plaintiff alleges were defective. Plaintiff complained about the appliances to Slocum and was told he could use the start-up funds to repair the appliances. During an in-home visit by Katie Pope and Deb Pope from MHAH,[23] Plaintiff was told to save his remaining start-up funds for emergencies.

In mid-July, 2010, Plaintiff placed a phone call to ELC's Quality Assurance Coordinator, Johnson, to complain about his grant. On or about July 26, 2010, Plaintiff went to ELC to complain about the start-up funds and other concerns he had regarding ELC. Plaintiff maintains that instead of addressing his concerns, Defendants Whitmore and Burgess conspired to commit him to the Osawatomie State Hospital.

Upon his release from the State Hospital, Plaintiff phoned ELC to inquire about the start-up funds and to request a new case manager. Defendant was assigned a new case manager, Dials, who helped him spend some of the start-up funds. Dials then told Plaintiff that ELC wanted him to use the funds to repair the washer, dryer and refrigerator. In November 2010, another case manager, Defendant Cyphers, advised Plaintiff that he could spend "so much per year" of the start-up funds. That same month, Plaintiff received a letter from MHAH stating that

[22]These statements are allegations drawn from Plaintiff's Complaint (Doc. 1), which Defendants set forth to identify the issues and conduct upon which Plaintiff bases his § 1983 claims.

[23]Plaintiff failed to obtain service of process on Defendants Katie Pope and Deb Pope, and the Court granted their motion to dismiss (Doc. 60).

start-up funds must be used within forty-five days of receipt of the grant.

Plaintiff mailed a complaint regarding the start-up funds to ELC, MHAH, the Disability Rights Center of Kansas, and HUD in Washington, D.C. on November 15, 2010, which states that a letter from ELC did not address Plaintiff's concerns regarding the start-up funds. Plaintiff contends the start-up funds "issue" brought him and Cyphers into dispute many times. Plaintiff received a letter from the Disability Rights Center of Kansas on May 21, 2011, which he contends was missing receipts from the purchases he made with Dials out of his start-up funds. Defendant Stanley told Cyphers to stay away from Plaintiff because he was upset about his start-up funds.

## III. Discussion

### A. Section 1983

Plaintiff alleges that the ELC Defendants violated his rights under the First, Fourth, Fifth and Fourteenth Amendments of the United States Constitution. Plaintiff contends that the ELC Defendants and MHAH conspired to defraud grant recipients with severe mental illnesses out of their start-up funds intended to furnish the recipients' homes. Plaintiff contends that all Defendants acted under the color of state law and are sued in both their official and individual capacities. Defendants move for summary judgment dismissing all claims against them because they are not "persons acting under color of state law" as required by § 1983.

Pursuant to 42 U.S.C. § 1983, any person who "under color of . . . [law] . . . subjects, or causes to be subjected, . . . any [person] . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured." Section 1983 was enacted to provide protections to those persons wronged by the misuse of

governmental power. While the statute itself creates no substantive civil rights, it does provide an avenue through which civil rights can be redeemed.[24] To state a claim for relief in a § 1983 action, a plaintiff must establish that he was (1) deprived of a right secured by the Constitution or laws of the United States and (2) that the alleged deprivation was committed under color of state law.[25] "The only proper defendants in a Section 1983 claim are those who represent the state in some capacity, whether they act in accordance with their authority or misuse it."[26]

Under certain circumstances, a private party may act under the color of state law for purposes of § 1983.[27] "Taking a flexible approach to an inherently murky calculation," courts use four different tests to determine whether a private individual acted under the color of law: (1) the public function test; (2) the nexus test; (3) the joint action test; and (4) the symbiotic relationship test.[28] Under the public function test, the "court determines whether a private entity has exercised 'powers traditionally exclusively reserved to the State.'"[29] Under the nexus test, the court examines whether the nexus between the government and the challenged conduct is so close that the conduct may be fairly treated as that of the state itself.[30] "That is, a state normally

---

[24]*See Wilson v. Stock,* 52 F.3d 1547, 1552 (10th Cir. 1995).

[25]*See Am. Mfr's Mut. Ins. Co. v. Sullivan,* 526 U.S. 40, 49–50 (1999).

[26]*Gallagher v. Neil Young Freedom Concert*, 49 F.3d 1442, 1447 (10th Cir. 1995) (internal quotations and citations omitted).

[27]*Tool Box v. Ogden City Corp.*, 316 F.3d 1167, 1175 (10th Cir. 2003); *see also Gallagher*, 49 F.3d at 1447 (discussing these four tests).

[28]*Tool Box*, 316 F.3d at 1175.

[29]*Id*. at 1176 (quoting *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 349 (1974); listing holding elections, performing necessary municipal functions, and running a nursing facility as powers that were traditionally exclusively reserved to the state).

[30]*Id*.

can be held responsible for a private decision only when it has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State."[31] Under the joint action test, state action exists if a private party willfully participates in joint action with the state by acting in concert to effect a deprivation of constitutional rights.[32] Last, under the symbiotic relationship test, a private party may be considered a state actor "if the state 'has so far insinuated itself into a position of interdependence' with a private party that 'it must be recognized as a joint participant in the challenged activity.'"[33] This last test has been read narrowly, and requires more than "extensive state regulation, the receipt of substantial state funds, and the performance of important public functions."[34]

The Supreme Court supplemented and clarified that these tests are entwined in the sense that all four "are, for all intents and purposes, tools for factual analysis that 'bear on the fairness of . . . an attribution [of state action].'"[35] Under *Brentwood*, courts are to "apply the tests only so far as they force courts to zero in on the fact-intensive character of a state action determination."[36]

The ELC Defendants argue that providing services described by Plaintiff, such as assisting mental health grant recipients with their funds from agencies like MHAH, does not

---

[31]*Id*. (quotations omitted).

[32]*Id*. (quoting *Dennis v. Sparks*, 449 U.S. 24, 27 (1980)).

[33]*Id*. (quoting *Burton v. Wilmington Parking Auth.*, 365 U.S. 715, 725 (1961)).

[34]*Id*. (quotation omitted).

[35]*Brentwood Academy v. Tenn. Secondary Sch. Athletic Assoc.*, 531 U.S. 288, 296 (2001).

[36]*Id*.

make an organization a state actor, citing *Dow v. Terramara, Inc.*[37] In that case, a non-profit organization contracted with three counties to provide facilities and services for mentally handicapped adults.[38] The court held that although the non-profit organization "performs a public function, it cannot be said that providing services and housing to mentally handicapped adults has been 'traditionally the *exclusive* prerogative of the State.'"[39] Thus, the court held the non-profit organization in *Dow* was not a state actor under the public function test. The court further held that simply because the organization in *Dow* was subject to extensive state regulation "does not make . . . the defendants state actors unless the regulation compelled or influenced" the action that resulted in the alleged violation of the plaintiff's rights.[40] ELC Defendants argue that because they perform similar functions to those in *Dow*, they likewise do not exercise powers traditionally and exclusively reserved to the State and are thus not public actors. Moreover, because Plaintiff does not allege any facts suggesting that state regulations governing the ELC Defendants compelled or influenced their actions in any way, the public function test does not demonstrate state action.

Judge Lungstrum addressed the issue of whether an entity similar to ELC was a state actor for §1983 liability purposes in *Rosewood Services, Inc. v. Sunflower Diversified Services, Inc.*,[41] explaining that in 1995 the Kansas legislature enacted the Developmental Disabilities Reform Act ("the DD Reform Act"), which provided that any community mental disability

---

[37]835 F. Supp. 1299, 1303 (D. Kan. 1993).

[38]*Id*. at1303.

[39]*Id*. (emphasis in the original).

[40]*Id*.

[41]No. 02-2140-JWL, 2003 WL 22090897 (D. Kan. Sept. 8, 2003).

facility would become the new community developmental disability organization ("CDDO") for its existing service area and, by virtue of its designation as a CDDO, would be imbued with certain statutory authorities and responsibilities, including disbursing funds.[42] In denying summary judgment, the court held that there was a material issue of fact regarding whether the non-profit organization and its director engaged in conduct that can fairly be attributed to the state and county governments because the organization administered components of the developmental disabilities program, which serves a public purpose, and SRS and county governments remained entwined in the organization's administration of that program.[43] In so ruling, the court noted that although *Dow* involved a similar entity, that case was decided in 1993, before the DD Reform Act that created the CDDO structure was enacted.

The Court concludes that ELC is more like Terramara in *Dow* than the state actor Sunflower in *Rosewood*. ELC is not a CDDO, but rather, a CMHC. As ELC Defendants point out, although formed under the same statute, the organizations are distinct. K.S.A. § 19-4001 states "the board of county commissioners of any county or the boards of county commissioners of two (2) or more counties jointly may establish a community mental health center, and/or community facility for the mentally retarded." In creating CDDO's, the DD Reform Act defines CDDO's as "any community facility for people with intellectual disability that is organized pursuant to K.S.A. 19-4001 through 19-4015 and amendments thereto."[44] ELC is not designated as a facility for people with an intellectual disability, but a community health center, so it cannot

---

[42]*Id*. at *1 (citing K.S.A. §§ 39-1801 to -1811).

[43]*Id*. at *20 (citing *Brentwood*, 531 U.S. at 296).

[44]K.S.A. § 39-1803(d). The statute was amended effective July 1, 2012, to reflect State policy to use "intellectual disability" in place of "mental retardation."

be a CDDO. Moreover, by statute, a county can only have one CDDO.[45] The designated CDDOs for Miami and Franklin Counties are Tri-Ko, Inc. and COF Training Services, Inc., respectively, and ELC is not a CDDO for any county.

In addition, ELC does not exhibit any of the qualities of a CDDO that would suggest state action, nor is it entwined with state or local government. ELC's board is self-selected and not appointed by the county commission. ELC does not control whether other organizations receive state funds or how they are used, nor does it control how the Blaylock grant funds that Plaintiff received are disbursed. Instead, MHAH is solely responsible for determining who receives the grant and what restrictions and requirements are placed on how the funds are spent. And, although ELC has a contract with SRS, ELC is merely a regulated entity that receives government funding. As the court noted in *Dow*, "state regulation . . . does not make Terramara and the other defendants state actors unless the regulation compelled or influenced the decision."[46] There is nothing in the record that shows state regulation compelled or influenced the interactions of which Plaintiff complains. Accordingly, the Court concludes that ELC is not a state actor and consequently, its employees are not subject to liability under § 1983 as they are not persons acting under the color of state law.

**B. Failure to Obtain Service**

Fed. R. Civ. P. 4(m) states,

> If a defendant is not served within 120 days after the complaint is filed, the court—on motion or on its own after notice to the plaintiff—must dismiss the action without prejudice against that defendant or order that service be made within a specified time.

---

[45]K.S.A. § 19-4001.

[46]*Dow*, 835 F. Supp. at 1303.

> But if the plaintiff shows good cause for the failure, the court must extend the time for service for an appropriate period.

On December 19, 2011, Plaintiff was granted additional time to obtain service on Defendants Whitmore and Coffman within 45 days of the date of the Order, or February 2, 2012, and was further ordered to provide the Clerk's Office with the current location and address for Defendants or obtain summons from the Clerk's Office with the updated addresses and return for service within twenty (20) days of the date of the Order.[47]  To date, neither Defendant has been served.

Plaintiff is hereby required to show good cause in writing to this Court on or before **October 5, 2012**, why service of summons and complaint was not made in this case upon Defendants Jason Whitmore and Colt Coffman by February 2, 2012, and shall further show good cause in writing to this Court why this action should not be dismissed as to those Defendants in its entirety without prejudice.

**IT IS THEREFORE ORDERED BY THE COURT** that the ELC Defendants' Motion for Summary Judgment (Doc. 61) is GRANTED;

**IT IS FURTHER ORDERED** that Plaintiff is ordered to show good cause in writing to this Court on or before **October 5, 2012**, why service of summons and complaint was not made in this case upon Defendants Jason Whitmore and Colt Coffman by February 2, 2012, and shall further show good cause in writing to this Court why this action should not be dismissed as to those Defendants in its entirety without prejudice.  The failure to file a timely response may result in the Complaint being summarily dismissed without further prior notice to Plaintiff.

**IT IS SO ORDERED.**

---

[47]Doc. 38.

Dated: September 18, 2012

S/ Julie A. Robinson

JULIE A. ROBINSON

UNITED STATES DISTRICT JUDGE